# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

VELMA MARTINEZ,

    Plaintiff,

    vs.                                                                  Civ. No. 23-93 MLG/KK

MARTIN O'MALLEY, Commissioner
of the Social Security Administration,[1]

    Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[2]

Before the Court is Plaintiff Velma Martinez's Motion to Reverse or Remand Administrative Agency Decision, with Supporting Memorandum (Doc. 16) ("Motion"), filed June 19, 2023. In the Motion, Ms. Martinez asks the Court to reverse the decision of Defendant the Commissioner of the Social Security Administration ("Commissioner") denying her claim for supplemental security income, and to remand this matter to the agency for a *de novo* hearing and decision. (*Id.* at 1, 20.) Having meticulously reviewed the parties' submissions, the record, and the relevant law, I find that the Administrative Law Judge ("ALJ") committed reversible error in formulating Ms. Martinez's residual functional capacity by failing to discuss how, if at all, her anxiety disorder impacts her ability to perform work-related mental functions. I therefore recommend that the Court GRANT Ms. Martinez's Motion, reverse the Commissioner's decision, and remand this matter for further administrative proceedings. However, I also find that any error

---

[1] Mr. O'Malley has been automatically substituted for his predecessor Kilolo Kijakazi as the Defendant in this suit. Fed. R. Civ. P. 25(d).

[2] By an Order of Reference (Doc. 25) entered on January 24, 2024, United States District Judge Matthew L. Garcia referred this case to me to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case.

in the ALJ's determination of Ms. Martinez's past relevant work was harmless and is therefore not a basis for granting Ms. Martinez's Motion.

## I. Factual Background and Procedural History

Ms. Martinez filed this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking reversal of the Commissioner's decision denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act. (Docs. 1, 16.) Ms. Martinez was born in December 1968, has a bachelor's degree, and has worked as a receptionist and secretary. (AR 41, 55-56, 77, 209, 251.[3]) She suffers from the medically determinable impairments of diabetes mellitus, migraines, right vestibular weakness with benign paroxysmal vertigo, obstructive sleep apnea, obesity, and generalized anxiety disorder. (AR 21-22.)

### A. Procedural History

Ms. Martinez applied for SSI in December 2019, alleging disability beginning on October 1, 2018, due to a "right weak inner ear." (AR 77-78, 91, 209.) She later amended her alleged onset date to December 11, 2018. (AR 50, 62-63.) Her claims were denied on initial consideration in March 2020, and on reconsideration in July 2021. (AR 77, 88.)

ALJ Michael Leppala held a hearing on August 29, 2022, at which Ms. Martinez and an impartial vocational expert ("VE") testified. (AR 36-64.) Ms. Martinez's attorney also attended the hearing. (AR 36-64.) On October 17, 2022, the ALJ issued an unfavorable decision. (AR 16-29.) The Appeals Council denied review on December 19, 2022, and the ALJ's decision became administratively final. (AR 2-5.) Ms. Martinez now seeks reversal and remand of the ALJ's decision finding that she is not disabled. (Docs. 1, 16.)

---

[3] Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on March 21, 2023. (Doc. 8.)

## B.     Record Evidence Regarding Ms. Martinez's Mental Impairments and Past Relevant Work[4]

### 1.   Medical Record Evidence Regarding Ms. Martinez's Mental Impairments

On September 30, 2019, Ms. Martinez completed an audiology questionnaire at the University of New Mexico Hospital, on which she wrote that she has anxiety because she "cannot sleep without taking a nerve pill" and that she takes Xanax[5] at night for sleep. (AR 364, 366.)

Ms. Martinez saw Peter Tiernan, M.D., for a variety of physical and mental complaints between October 2019 and June 2022. (*See generally* AR 429-517, 553-62, 686-712, 759-83.) On October 3, 2019, she saw him for, among other things, anxiety, and he diagnosed her with generalized anxiety disorder and prescribed Xanax. (AR 441.)

Ms. Martinez saw Dr. Tiernan again on October 10, 2019, and October 17, 2019, and in his notes regarding these appointments, he recorded that she complained of "[n]on suicidal" anxiety and "Xanax helps," and that he found her to be well-groomed and talkative. (AR 439-40.) On October 10, he diagnosed her with anxiety disorder, unspecified, and on October 17, with generalized anxiety disorder. (AR 439-40.)

At visits on November 2, 2019, November 9, 2019, and November 23, 2019, Dr. Tiernan found Ms. Martinez to be well-groomed, talkative, and hypomanic,[6] noting that he "had to stop her talking because [he] could not get her prescriptions written while she was talking." (AR 436-38.) On November 2, he diagnosed Ms. Martinez with anxiety disorder, unspecified. (AR 438.)

---

[4] Although I have meticulously reviewed the entire record, I limit my discussion of the evidence to Ms. Martinez's mental impairments and past relevant work, because she limits her claims of error to these areas. (*See generally* Docs. 16, 23.)

[5] Alprazolam, or Xanax, is used to treat anxiety disorders and panic disorder. https://medlineplus.gov/druginfo/meds/a684001.html (last accessed Feb. 22, 2024).

[6] "Hypomania is a condition in which you display a revved up energy or activity level, mood or behavior ... beyond your usual self. Hypomania is a less severe form of mania, and both are commonly part of bipolar disorder." Cleveland Clinic, "Hypomania," https://my.clevelandclinic.org/health/diseases/21774-hypomania (last accessed Feb. 22, 2024).

In his notes regarding appointments on December 7, 2019, and January 11, 2020, Dr. Tiernan wrote that he did not "want [Ms. Martinez] to be on Xanax for migraines," and repeated that he found her to be well-groomed, overly talkative, and hypomanic. (AR 431, 433, 435, 476-77.) On January 11, he renewed her Xanax prescription. (AR 477.)

Similarly, at appointments on January 20, 2020, and February 24, 2020, Dr. Tiernan found Ms. Martinez to be well-groomed and hypomanic, and, on January 20, overly talkative. (AR 453, 479.)

According to Dr. Tiernan's notes, when Ms. Martinez saw him on March 26, 2020, she wanted "meds for anxiety" and he was "not t[a]pering [X]anax today." (AR 505.) He also recorded that Ms. Martinez "called [his] secretary beautiful" and he asked her "not to say things like that anymore, because someone might complain," though "the office staff … don't mind much" and "[e]veryone slips up nowadays." (AR 505.) He again found Ms. Martinez to be overly talkative and hypomanic, and renewed her Xanax prescription. (AR 506.)

On May 11, 2020, Ms. Martinez saw neurologist Vanessa Licona-Sanjuan, M.D., for migraines. (AR 535, 538.) On mental status exam, Dr. Licona-Sanjuan found that Ms. Martinez was oriented to person, place, and time, followed three-step commands, had "good" knowledge and normal attention, speech, and comprehension, and was alert and able to "name object," read, repeat, and write. (AR 538.) Similarly, on neurologic exams on September 4, 2020, July 1, 2021, and April 15, 2022, Dr. Licona-Sanjuan found that Ms. Martinez had normal memory, insight, and judgment, orientation to time, place, person, and situation, and appropriate mood and affect.[7] (AR 523-24, 568, 666.)

_____

[7] On April 15, 2022, Dr. Licona-Sanjuan prescribed amitriptyline for Ms. Martinez's migraines. (AR 663-66.) Amitriptyline is used to treat depression, eating disorders, and post-herpetic neuralgia, and to prevent migraine headaches. https://medlineplus.gov/druginfo/meds/a682388.html (last accessed Feb. 22, 2024).

According to Dr. Tiernan's notes, when Ms. Martinez saw him on May 3, 2021, she still had anxiety and wanted Xanax, "which we are tapering slowly." (AR 555.) He added that tapering was "difficult" due to "some substance abuse issues in the past." (AR 555.) On exam, he found that she was "hypo manic at times" but had "good eye contact," "no delusions," and "good memory." (AR 555-56.) He again diagnosed her with generalized anxiety disorder and, under "Patient Instructions," wrote "psych counseling done." (AR 556.)

On May 5, 2021, and June 3, 2021, Dr. Tiernan saw Ms. Martinez "for disability forms." (AR 686, 689.) In his notes regarding these visits, he again referenced Ms. Martinez's anxiety, hypomania, good eye contact and memory, no delusions, and diagnosis of generalized anxiety disorder. (AR 686-90.) In his notes regarding May 5, he again wrote "psych counseling done" under Patient Instructions. (AR 688.) On June 3, he renewed Ms. Martinez's Xanax prescription. (AR 691.)

In his notes regarding appointments on June 30, 2021, August 2, 2021, September 8, 2021, October 7, 2021, and November 10, 2021, Dr. Tiernan again referenced Ms. Martinez's anxiety, hypomania, good eye contact and memory, no delusions, and diagnosis of generalized anxiety disorder. (AR 692-701.) Under Patient Instructions, he wrote "to er prn suicide" and "taper controlled substances." (AR 693, 695, 697, 699, 701.) At all of these appointments except on June 30, he renewed Ms. Martinez's Xanax prescription. (AR 695, 697, 699, 701.)

In his notes regarding visits on December 28, 2021, February 1, 2022, and March 1, 2022, Dr. Tiernan wrote that it was "unlikely" he would "be able to taper [Ms. Martinez] rapidly due to her previous medical problems." (AR 702, 704, 706.) He again referenced her anxiety, good eye contact and memory, no delusions, and diagnosis of generalized anxiety disorder, instructed her "to er prn suicide" and "taper controlled substances," and added "no guns." (AR 702-07.) In his

notes regarding December 28 and February 1, he also referenced her hypomania, (AR 702, 704), and on December 28 and March 1, he renewed her Xanax prescription. (AR 703, 707.)

On March 10, 2022, and April 12, 2022, Ms. Martinez saw Bettina Pangan, C.N.P., for obstructive sleep apnea. (AR 583-88.) At these appointments, CNP Pangan found Ms. Martinez to be "[c]onversant with normal (coherent, nontangential, non-pressured) speech and content." (AR 583, 586.)

In his notes regarding visits on May 4, 2022, May 24, 2022, and June 30, 2022, Dr. Tiernan again wrote that Ms. Martinez had anxiety and he would likely be unable to taper her Xanax rapidly. (AR 759-60, 762.) He again diagnosed her with anxiety disorder, unspecified and, on May 24 and June 30, renewed her Xanax prescription. (AR 759-63.)

On May 13, 2022, Ms. Martinez presented to Kisria Rechul, M.D., for weight management. (AR 715-23.) At this appointment, Dr. Rechul found that Ms. Martinez was "[c]onversant with normal (coherent, nontangential, non-pressured) speech and content" and "[c]ordial with normal range of affect," that she had "[i]ntact judgment and insight, with appropriate responses," and that her mood was "[a]ppropriate." (AR 720.)

    2.   *Prior Administrative Findings and Medical Source Opinions Regarding Ms. Martinez's Mental Impairments*

On March 11, 2020, state agency psychological consultant Mark McGaughey, Ph.D., noted that Ms. Martinez had not alleged a mental impairment in her application for SSI but had reported difficulty concentrating in a function report. (AR 82.) He asserted that the record evidence "does not report a recommendation of [treatment] for a mental impairment, there is no mental [medically determinable impairment], and there are no limitations in basic work activities." (AR 82.) He found that "[f]urther development" of Ms. Martinez's difficulty concentrating was "not warranted as current evidence does not suggest severe functional limitations from a mental impairment." (AR

82.)

On April 2, 2020, Dr. Tiernan completed two medical source statement forms. (AR 507-17.) On one of these forms, entitled "Medical Source Statement, General," he indicated that Ms. Martinez suffers from anxiety as well as four physical conditions, and that depression, anxiety, "[p]ersonality disorder," and "psychological factors" affect her physical conditions.[8] (AR 511-12.) On this form, he opined that Ms. Martinez's symptoms were "frequently" "severe enough to interfere with attention and concentration needed to perform even simple work tasks," and that she would frequently need to lie down and to miss work unpredictably.[9] (AR 513, 516.) He did not specify which condition or combination of conditions caused each of these limitations.[10] (AR 513, 516.)

On July 22, 2021, state agency psychological consultant Rachel Morrisey, Ph.D., found that Ms. Martinez has mild limitations in the areas of: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and, (4) adapting or managing oneself. (AR 99.) Dr. Morrisey further found no evidence of a severe mental impairment "that would warrant further … development," and that the totality of the medical record evidence supported a "not severe" rating. (AR 100.) Dr. Morrisey explained that Ms. Martinez's activities of daily living showed "fairly mild mental limitations," the medical record evidence showed "no serious abnormalities in behavior, thought content/process,

---

[8] Dr. Tiernan did not list any mental health diagnoses on the other form, entitled "Medical Source Statement, Auditory/Vestibular Disturbance." (AR 507.)

[9] However, on the April 2020 Auditory/Vestibular Disturbance form, Dr. Tiernan opined that Ms. Martinez would *not* frequently need to miss work unpredictably. (AR 510.) Dr. Tiernan did not indicate whether this discrepancy was intentional on either of the forms he completed in April 2020. (AR 507-17.)

[10] On May 5, 2021, Dr. Tiernan wrote to Disability Determination of Arkansas that Ms. Martinez "is 100% disabled." (AR 553.) However, the ALJ found that this opinion concerns an issue reserved to the Commissioner, and Ms. Martinez does not challenge that portion of the ALJ's decision. (AR 26; *see generally* Doc. 16.)

perception, orientation or memory" and "basic independent adult functional capacities," and Ms. Martinez presented "with normal psych on routine PY[11] [office visits]." (AR 100.)

On July 7, 2022, Dr. Tiernan completed two additional medical source statements. (AR 771-83.) On one of these forms, entitled "Medical Source Statement, General," he listed the diagnosis code for anxiety disorder, unspecified (F419), as well as four other diagnosis codes.[12] (AR 771.) On this form, he wrote that Ms. Martinez "needs antidepressants and anti anxiety meds to function," that depression, anxiety, somatoform disorder, and "psychological factors" affect her physical condition, that anxiety and stress aggravate her condition, and that she had suffered or does suffer from substance abuse issues.[13] (AR 771-72, 774.) He opined that Ms. Martinez's symptoms would "constantly" interfere with attention and concentration needed to perform simple work tasks, and she would frequently need to lie down and to miss work unpredictably.[14] (AR 773, 776.) He did not specify which condition or combination of conditions caused each of these limitations. (AR 773, 776.)

   3.   *Adult Function Reports and Hearing Testimony regarding Ms. Martinez's Mental Impairments*

In a January 2020 Adult Function Report, Ms. Martinez indicated that, on days when she

---

[11] Dr. Morrisey did not define "PY" in her findings. (AR 98-100.) However, elsewhere in the agency's reconsideration determination form, "PY" is used in contrast with "MN," and appears to relate to physical impairments, versus mental ones. (*See, e.g.*, AR 98.)

[12] Dr. Tiernan did not list any mental health diagnoses on the other form, entitled "Medical Source Statement, Chronic Headaches/Migraines," though he did note that the "psychological conditions" of depression, anxiety, and "psychological factors" affect Ms. Martinez's physical condition. (AR 778, 781.)

[13] However, on the July 2022 Chronic Headaches/Migraines form, Dr. Tiernan indicated that Ms. Martinez had not suffered and does not suffer from substance abuse issues. (AR 781.) Dr. Tiernan did not indicate whether this discrepancy was intentional on either of the forms he completed in July 2022. (AR 771-783.)

[14] However, on the July 2022 Chronic Headaches/Migraines form, Dr. Tiernan indicated that Ms. Martinez would *not* need to lie down frequently. (AR 783.) Dr. Tiernan did not indicate whether this discrepancy was intentional on either of the forms he completed in July 2022. (AR 771-783.)

does not have migraines and can sleep, she cares for her disabled eight-year-old child, cleans house, and prepares meals. (AR 258.) She wrote that she shops for groceries, drives a car, handles finances, talks to friends on the phone, takes her child to Explora once a month, has no problem getting along with others, and gets along "fine" with authority figures. (AR 261-64.) However, she also noted that she has difficulty reading, looking at a laptop, and concentrating, can only pay attention for ten minutes, rarely takes part in social activities, has some difficulty following instructions, cannot handle stress, was fired or laid off from a job because her boss said she was "out of line," does not handle changes in routine well, and becomes "quite fearful" when she is off of Xanax. (AR 262-64.) She wrote that she tries not to take Xanax during the day because it knocks her out but she does sometimes if she feels tremors after stressful situations. (AR 264.)

In a March 2021 Adult Function Report, Ms. Martinez wrote that she "cannot handle high levels of stress due to the instability of [her] conditions" and that some days she "stay[s] in bed if [she] feel[s] the anxiety of the migraines." (AR 300.) She added that, when "[e]arthquakes … keep [her] up," she is "manic the next day" and "[c]annot concentrate." (AR 301.) She reported that she cares for her child, has no problems with personal care, prepares simple meals, cleans and does laundry, goes outside twice a week, drives a car, shops, handles finances, and goes out to eat once a month. (AR 300-04.) However, she also indicated that she can only read or be on the computer for 20 minutes, experiences "[a]nxiety to complete tasks," can only pay attention for five to ten minutes, and is "so-so" at following written instructions and anxious about following spoken ones. (AR 304-05.) She further wrote that she gets along with authority figures "OK" on some days but "not so well" on others, and she does not handle stress or changes in routine well at all. (AR 306.) She listed drowsiness as a side effect of Xanax. (AR 307.)

Ms. Martinez did not mention anxiety at her August 2022 hearing. (*See generally* AR 36-

64.) At the hearing, she testified that she takes Xanax for migraine headaches, neck pain, and tremors due to an inner ear problem, and that it "knocks [her] out." (AR 44, 46, 50-52.) She also testified that on the one to two days per week when she does not have a migraine, she cleans, does laundry and yardwork, and grocery shops. (AR 49, 54.)

### 4.   Record Evidence Regarding Ms. Martinez's Past Relevant Work

Agency records indicate that, while employed at New Mexico Works Career Link LLC ("NM Works"), Ms. Martinez earned $2,820 in 2015, and $10,870 in 2016. (AR 216-17.) Ms. Martinez's income tax returns also indicate that she earned $10,870 in 2016. (AR 230-45.)

In a January 2020 Work History Report, Ms. Martinez indicated that she worked at NM Works for eight hours per day, five days per week, from June 2015 to December 2016. (AR 266, 268.) She wrote that NM Works paid her $9 per hour, although there appears to be a small question mark next to this figure. (AR 268.) In her remarks, she added that she was currently staying home to care for her disabled young child. (AR 273.)

At her August 2022 hearing, Ms. Martinez testified that she worked for NM Works for a year, filing papers, receiving food stamp applicants, and helping them with their applications. (AR 42-43.) Asked how many hours per week she worked at this job, she responded, "a 40-hour weekday [sic]." (AR 43.)

At the hearing, the VE classified Ms. Martinez's job at NM Works as that of a receptionist. (AR 55-56.) The VE testified that a hypothetical individual with Ms. Martinez's assessed residual functional capacity ("RFC")[15] could perform this past work, as well as the representative occupations of marker, folder, and office helper. (AR 58-59.) However, the VE also indicated that

---

[15] An individual's RFC is "the most [the individual] can still do despite [her physical and mental] limitations." 20 C.F.R. § 416.945(a)(1).

employers typically tolerate absenteeism, arriving late, or leaving early no more than one day per month, and being off task no more than six to seven percent of the workday. (AR 60-61.)

## II.  The ALJ's Decision

In his unfavorable decision, the ALJ applied the Commissioner's five-step sequential evaluation process ("SEP").[16] (AR 19-29.) At step one, the ALJ found that Ms. Martinez has not engaged in substantial gainful activity since her application date. (AR 21.)

At step two, the ALJ found that Ms. Martinez suffers from the severe impairments of diabetes mellitus, migraines, and right vestibular weakness with benign paroxysmal vertigo. (AR 21.) He further found that Ms. Martinez's medically determinable impairments of obstructive sleep apnea, obesity, and generalized anxiety disorder are non-severe. (AR 21-23.)

At step three, the ALJ determined that Ms. Martinez's impairments or combination of impairments do not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 23.)

At step four,[17] the ALJ determined that Ms. Martinez has the RFC

---

[16] The five-step SEP requires the ALJ to determine whether:

(1)     the claimant engaged in substantial gainful activity during the alleged period of disability;
(2)     the claimant has a severe physical or mental impairment (or combination of impairments) that meets the duration requirement;
(3)     any such impairment meets or equals the severity of an impairment listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P;
(4)     the claimant can return to her past relevant work; and, if not,
(5)     the claimant is able to perform other work in the national economy, considering her RFC, age, education, and work experience.

20 C.F.R. § 416.920(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the burden of proof in the first four steps of the analysis and the Commissioner has the burden of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A finding that the claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

[17] Step four involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must consider all of the relevant evidence and determine the claimant's RFC. 20 C.F.R. § 416.945(a)(1). Second, the ALJ must determine the physical and mental demands of the claimant's past work. *Winfrey*, 92 F.3d at 1023. Third, the ALJ must determine whether the claimant is capable of meeting those demands given her RFC. *Id.* A claimant who can perform her past relevant work is not disabled. 20 C.F.R. § 416.920(f).

> to perform light work as defined in 20 [C.F.R. §] 416.967(b) except that she is limited to occasional climbing of ramps or stairs, no climbing of ladders, ropes, or scaffolds, and occasional balancing, stooping, kneeling, crouching, and crawling. [Ms. Martinez] is further limited to frequent exposure to extreme cold, extreme heat, humidity, and pulmonary irritants such as fumes, noxious odors, dusts, gases, mists, and poorly ventilated areas. She can tolerate no more than a moderate level of noise, and she must avoid all exposure to unprotected heights, dangerous machinery, and moving machinery.

(AR 23.) The ALJ further found that Ms. Martinez's job at NM Works qualified as past relevant work and that her RFC would allow her to perform it. (AR 27.)

Alternatively, the ALJ proceeded to step five, at which he found that an individual of Ms. Martinez's age and with her education, work experience, and RFC could perform other jobs existing in significant numbers in the national economy. (AR 27-29.) Specifically, the ALJ determined that an individual with Ms. Martinez's characteristics could perform the requirements of the representative unskilled, light occupations of marker and office helper. (AR 28.) For these reasons, the ALJ concluded that Ms. Martinez was not disabled from December 2, 2019, through the date of his decision. (AR 29.)

## III. <u>Standard of Review</u>

A federal court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004). In making these determinations, a court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070-71 (10th Cir. 2007). In other words, courts do not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). A court will not disturb the agency's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record," *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). A court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (quotation marks and brackets omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). If the ALJ fails to do so, "the case must be remanded for the ALJ to set out his specific findings and his reasons for accepting or rejecting evidence[.]" *Id.* at 1010.

In reviewing an ALJ's decision, courts only consider arguments "adequately briefed for … review." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012). In addition, where a court "can follow the adjudicator's reasoning" and "determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal." *Id.* at 1166.

## IV.  <u>Analysis</u>

A.   **The ALJ committed reversible error in formulating Ms. Martinez's RFC by failing to address how her anxiety disorder impacts her work-related mental functions.**

In her Motion, Ms. Martinez argues that the ALJ committed reversible error by failing to discuss her anxiety disorder after step two of the SEP. (Doc. 16 at 1, 13-20.) More particularly, she argues that the ALJ erred in formulating her RFC at step four by failing to address how, if at all, her anxiety disorder impacts her ability to perform work-related mental functions. (*Id.*) For the reasons discussed below, I agree.

1.   *The ALJ erred in formulating Ms. Martinez's RFC by failing to address how her anxiety disorder impacts her work-related mental functions.*

Ms. Martinez's claim of error rests on the distinct ways that an ALJ must analyze mental impairments at steps two and four of the SEP. In general, at step two, an ALJ must determine whether the claimant has a "severe" medically determinable impairment or combination of impairments that meets the agency's duration requirement. 20 C.F.R. § 416.920(a)(4)(ii). An impairment or combination of impairments is severe when it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 416.922(a).

But an ALJ must use the Commissioner's "special technique" to evaluate the severity of mental impairments at step two. 20 C.F.R. § 416.920a(a). Pursuant to this special technique, an ALJ must "rate the degree of functional limitation resulting from" any medically determinable mental impairment in "four broad functional areas," *i.e.*, "[u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." 20 C.F.R. § 416.920a(b)(2), (c)(3). The ALJ must rate the degree of limitation in each area as "[n]one, mild, moderate, marked, [or] extreme." 20 C.F.R. § 416.920a(c)(4). If the ALJ rates the degree of limitation as "none" or "mild," he "will generally conclude that [the] impairment[] is not severe, unless the evidence otherwise indicates that there is more than a

minimal limitation in [the claimant's] ability to do basic work activities." 20 C.F.R. § 416.920a(d)(1).

Although a claimant must have at least one severe impairment or combination of impairments for the SEP to proceed past step two, 20 C.F.R. § 416.920(a)(4)(ii), an ALJ must consider all of the claimant's medically determinable impairments, including ones that are not severe, in formulating her RFC at step four. 20 C.F.R. § 416.945(a)(2).

> While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

SSR 96–8p, 1996 WL 374184, at *5 (Jul. 2, 1996).

Importantly, the criteria used to assess the severity of a mental impairment at step two of the SEP are "not an RFC assessment," and

> [t]he mental RFC assessment used at steps 4 and 5 of the [SEP] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the [Psychiatric Review Technique Form].

SSR 96–8p, 1996 WL 374184, at *4. There are twenty specific work-related mental functions to

be considered in formulating a mental RFC.[18] POMS DI § 24510.060(B)(2)(b).[19] A mental RFC should identify the broad area(s) of mental functioning at issue, and then discuss the specific work-related "functions that the individual has demonstrated that he/she can do, as well as any limitations of those functions." POMS DI § 24510.065(B)(1). In particular, a mental RFC should, among other things, "[i]ndicate the extent to which the individual could be expected to perform and sustain the activity" in question. *Id.*

In accordance with the foregoing administrative authority, the Tenth Circuit has held that, when an ALJ finds one or more mild restrictions in a claimant's four broad areas of mental functioning due to a non-severe mental impairment at step two, he must further analyze the impairment's work-related impact in formulating the claimant's RFC at step four. *Wells v. Colvin*, 727 F.3d 1061, 1064-65, 1068-69 (10th Cir. 2013); *see also McFerran v. Astrue*, 437 F. App'x 634, 638 (10th Cir. 2011) (ALJ's RFC determination was "defective" because, among other things, ALJ "made no findings on what, if any, work-related limitations resulted from [the claimant's non-

---

[18] The twenty work-related mental functions to be considered in assessing a mental RFC are:  (a) in the area of understanding and memory, the abilities to:  (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; and, (3) understand and remember detailed instructions; (b) in the area of sustained concentration and persistence, the abilities to:  (4) carry out very short and simple instructions; (5) carry out detailed instructions; (6) maintain attention and concentration for extended periods; (7) perform activities within a schedule, maintain regular attendance, and be punctual; (8) sustain an ordinary routine without special supervision; (9) work in coordination with or proximity to others without being distracted by them; (10) make simple work-related decisions; and, (11) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (c) in the area of social interaction, the abilities to: (12) interact appropriately with the general public; (13) ask simple questions or request assistance; (14) accept instructions and respond appropriately to criticism from supervisors; (15) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and, (16) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and, (d) in the area of adaptation, the abilities to:  (17) respond appropriately to changes in the work setting; (18) be aware of normal hazards and take appropriate precautions; (19) travel in unfamiliar places or use public transportation; and, (20) set realistic goals or make plans independently. POMS DI § 24510.060(B)(2)(b); Form SSA-3734-F4-SUP.

[19] The POMS "is a set of policies issued by the [Social Security Administration] to be used in processing claims." *Ramey v. Reinertson*, 268 F.3d 955, 964 (10th Cir. 2001) (quotation marks omitted). The Court must "defer to the POMS provisions unless [it] determine[s] they are arbitrary, capricious, or contrary to law." *Id.* at 964 n.2 (quotation marks omitted).

severe mental impairments]"). In so holding, the *Wells* court relied on the Commissioner's regulations and rulings that:  (1) an "ALJ must consider the combined effect of all of the claimant's medically determinable impairments, *whether severe or not severe*," in assessing the claimant's RFC; (2) an ALJ may not "simply rely on his finding of non-severity" at step two "as a substitute for a proper RFC analysis" at step four; and, (3) "most importantly," the ALJ's step-four RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence." *Id.* at 1064–65 (emphasis in original) (quotation marks and ellipses omitted).

Here, the ALJ did address Ms. Martinez's anxiety disorder at step two. (AR 22-23.) Specifically, in his step-two discussion, the ALJ considered the four "broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders," and found that Ms. Martinez "has mild limitation" in each of them. (AR 22.) The ALJ also described record evidence supporting and refuting the existence of limitations in each of the four areas, stating that:

- As to understanding, remembering, or applying information, Ms. Martinez reported some difficulty following written and spoken instructions but consistently demonstrated good knowledge, normal comprehension and memory, and the ability to read and write on mental status exams, (AR 22);

- As to interacting with others, Ms. Martinez reported "limited" social activities but no problem being in public or getting along with others, and her mental status exams were consistently normal, with her appearing "talkative, conversant, pleasant, and cooperative, with normal speech," (AR 22);

- As to concentrating, persisting, or maintaining pace, Ms. Martinez reported having a limited attention span that curtailed her reading, but watched television several hours a day, and was consistently alert and oriented with normal attention on mental status exams, (AR 22); and,

- As to adapting or managing oneself, Ms. Martinez:  (1) reported being unable to handle stress or changes in routine well but had no problem taking care of personal needs and finances; (2) received "only conservative treatment with medications" and no "ongoing treatment from a mental health specialist" despite "occasional reports of anxiety"; and, (3) consistently demonstrated normal insight, judgment,

grooming, and motor activity on mental status exams. (AR 22.)

Concluding his step-two discussion of Ms. Martinez's anxiety disorder, the ALJ stated that

> [b]ecause [Ms. Martinez's] medically determinable mental impairment causes no more than "mild" limitation in any of the functional areas <u>and</u> the evidence does not otherwise indicate that there is more than a minimal limitation in [her] ability to do basic work activities, it is nonsevere[.]

(AR 23 (emphasis in original).)

However, the ALJ did not address Ms. Martinez's anxiety disorder in his step-four analysis. (AR 23-27.) More particularly, he did not, for each broad area of mental functioning, discuss which specific work-related mental functions Ms. Martinez has shown she can do, any limitations of those functions, and the extent to which she could be expected to perform and sustain the activities in question. (AR 23-27.) In this regard, the ALJ failed to provide the Court with a sufficient basis to determine that he applied correct legal standards in formulating Ms. Martinez's RFC. *Keyes-Zachary*, 695 F.3d at 1166; *Jensen*, 436 F.3d at 1165; *see Wells*, 727 F.3d at 1064-65, 1068-69; *McFerran*, 437 F. App'x at 638.

The Commissioner argues that the ALJ adequately addressed Ms. Martinez's anxiety disorder at step four because he evaluated the prior administrative findings of the state agency psychological consultants at this step. (Doc. 22 at 1-2, 6, 8.) And it is true that when an ALJ discusses a claimant's mental impairment "to some degree," though not "comprehensive[ly]," at step four, the discussion "might … satisf[y] the ALJ's obligation … to provide a more detailed assessment of [the claimant's] ability to complete various job functions as part of determining her RFC," provided the assessment is supported by substantial evidence. *Wells*, 727 F.3d at 1069. Here, however, the ALJ's discussion of the state agency psychological consultants' findings did not satisfy his obligation to further analyze Ms. Martinez's ability to perform various mental job functions in formulating her RFC at step four, for two interrelated reasons.

First, state agency psychological consultants Drs. McGaughey and Morrisey did not assess Ms. Martinez's mental RFC, and their findings wholly failed to address any of the specific work-related mental functions to be considered in formulating one. (AR 82-83, 98-100.) Rather, Dr. McGaughey found that "[n]o mental medically determinable impairments [were] established" and "[f]urther development [was] not warranted," because "current evidence does not suggest severe functional limitations from a mental impairment." (AR 82.) And Dr. Morrisey, though she found mild limitations in Ms. Martinez's four broad areas of mental functioning, likewise concluded that there was "[n]o evidence of severe [mental] impairment that would warrant further [mental] development" and that the "[t]otality of [the medical record evidence] supports a not severe rating." (AR 99-100 (capitalization omitted).)

Second, although the ALJ included his discussion of Drs. McGaughey's and Morrisey's findings in his step-four analysis, he effectively acknowledged that these consultants considered only the step-two issue of severity, determining that "*[t]heir finding of no severe mental impairment* is consistent with the treatment records." (AR 26 (emphasis added).) In other words, notwithstanding its location in the step-four section of his decision, the ALJ's discussion of Drs. McGaughey's and Morrisey's findings is substantively limited to the step-two issue of severity, like the findings themselves. Thus, the ALJ's evaluation of these findings does not constitute an adequate step-four mental RFC analysis.[20]

---

[20] Ms. Martinez does not argue that the ALJ failed to adequately support his evaluation of Dr. McGaughey's prior administrative finding. (*See generally* Docs. 16, 23.) However, I note that the ALJ failed to discuss significantly probative evidence undercutting Dr. McGaughey's finding, specifically:  (a) medical record evidence that Dr. Tiernan prescribed Xanax to treat Ms. Martinez's anxiety disorder, (AR 439-41, 505-06, 555, 689-91, 694-707, 760-63), which undercuts Dr. McGaughey's contention that the medical record evidence "does not report a recommendation of [treatment] for a mental impairment," (AR 82); (b) Dr. Tiernan's frequent findings of hypomania, (AR 435-38, 477, 479, 506, 555, 687, 690, 692, 694, 697, 699-700, 702, 704), which Dr. McGaughey ignored, (AR 82); (c) Dr. Tiernan's formal diagnoses of an anxiety disorder, (AR 438-41, 556, 688, 690, 693, 695, 697, 699, 701, 703, 705, 707, 759-60, 762), which undercut Dr. McGaughey's assertion of "no mental medically determinable impairments," (AR 82); and, (d) Ms. Martinez's reports of some difficulty following spoken and written instructions, (AR 263, 305), getting along with others, (AR 264, 306), and handling stress and changes in routine, (AR 264, 300, 306), and Dr. Tiernan's

The Commissioner also argues that the ALJ's step-four analysis of Ms. Martinez's anxiety disorder was adequate because, in weighing the prior administrative findings of Drs. McGaughey and Morrisey, the ALJ referenced his own step-two discussion of Ms. Martinez's treatment records. (Doc. 22 at 8; *see* AR 26.) However, in general, an evaluation of severity is "not an RFC assessment." SSR 96–8p, 1996 WL 374184, at *4. And here, as explained below, the ALJ's step-two severity analysis does not satisfy the substantive requirements of a step-four mental RFC analysis.

As previously noted, a mental RFC analysis should, among other things, discuss the specific work-related functions that the claimant has shown she can do, any limitations of those functions, and the extent to which she could be expected to perform and sustain the activities in question. POMS DI § 24510.065(B)(1). But here, the ALJ's step-two discussion does none of these things. (*See* AR 22.) The Court would have to guess at which of Ms. Martinez's specific work-related mental functions the ALJ believed to be mildly limited based on his discussion of her broad areas of mental functioning. (*Id.*) And the ALJ's step-two discussion provides no indication of the extent to which he believed Ms. Martinez could be expected to perform and sustain the work-related mental activities in question.[21] (*Id.*) Nor does the ALJ's step-four reference to his step-two

---

notations of socially inappropriate conduct at appointments, (AR 435-38, 476, 505), which collectively undercut Dr. McGaughey's finding that "there are no limitations in basic work activities." (AR 82.) The ALJ's failure to discuss any of this significantly probative contradictory evidence further undermines the adequacy of his evaluation of Dr. McGaughey's finding as a mental RFC analysis.

[21] Ms. Martinez does not argue that the ALJ's step-two analysis of her anxiety disorder is not supported by substantial evidence. (Docs. 16, 23.) However, I note that the ALJ found that Ms. Martinez reported "no problem getting along with others," (AR 22), without discussing her reports of some difficulty getting along with others, (AR 264, 306), and that her mental status examinations were "consistently normal, with [Ms. Martinez] appearing talkative, conversant, pleasant, and cooperative, with normal speech," (AR 22), without mentioning Dr. Tiernan's frequent findings of hypomania, (AR 435-38, 477, 506, 555, 687-90, 692, 694, 697, 699-700, 702, 704), or his notations of socially inappropriate conduct at some appointments. (AR 435-38, 476, 505.) Further, the ALJ characterized Ms. Martinez's reports of anxiety as "occasional," citing to only two pages in the record, (AR 22 (citing AR 555, 759)), but failed to mention or cite to the medical record evidence showing at least sixteen other occasions on which Ms. Martinez reported anxiety to providers. (AR 364, 439-41, 505, 686, 689, 692, 694, 696, 698, 700, 702, 704, 760, 762.) The

analysis do anything to remedy these deficiencies. (AR 26.) In short, neither the ALJ's step-two severity analysis nor his step-four reference to it is an adequate substitute for a proper step-four analysis of Ms. Martinez's mental RFC.

Finally, the Commissioner argues that the Court should take the ALJ at his word when he recited that he was required to "consider all of [Ms. Martinez's] impairments, including impairments that are not severe," in formulating her RFC. (Doc. 22 at 7-8; AR 20-21.) However, in the absence of any substantive step-four analysis of Ms. Martinez's anxiety disorder, the ALJ's step-four reference to his step-two analysis undermines his boilerplate acknowledgment and strongly suggests that he improperly relied on his step-two finding of non-severity to conclude at step four that Ms. Martinez has no work-related limitations based on her mental impairment. *See Wells*, 727 F.3d at 1069 (ALJ's statement that his step-two "findings do not result in further limitations in work-related functions in the [RFC] assessment below" suggested that ALJ may have improperly "relied on his step-two findings to conclude that [the claimant] had no limitation based on her mental impairments" at step four); *see generally Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004) (rejecting ALJ's use of boilerplate language); *Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009) (when an ALJ states that he has considered evidence, courts will take the ALJ at his word where the decision supports that statement).

Of course, a step-two finding of mild or even moderate restrictions in the four broad areas of mental functioning does not mandate the inclusion of mental limitations in a claimant's RFC at step four. *Bales v. Colvin*, 576 F. App'x 792, 798 (10th Cir. 2014); *Beasley v. Colvin*, 520 F. App'x 748, 754 (10th Cir. 2013). As the Tenth Circuit has observed, a step-two limitation "does not

---

ALJ's failure to discuss any of this significantly probative contradictory evidence further undermines the adequacy of his step-two analysis as a substitute for a proper mental RFC analysis at step four.

necessarily translate to a work-related functional limitation for the purposes of the RFC assessment." *Bales*, 576 F. App'x at 798 (emphasis added). But here, Ms. Martinez does not argue, nor do I find, that the ALJ erred by failing to include any particular mental limitation in her RFC. Rather, Ms. Martinez argues, and I find, that the ALJ erred by failing to discuss whether any such limitations were warranted and, if so, the nature and extent of these limitations.

In sum, Tenth Circuit law and agency rules and regulations require ALJs to consider the combined effects of a claimant's severe and non-severe impairments in assessing the claimant's RFC at step four, because limitations from a non-severe impairment, in combination with limitations from other impairments, may prevent the claimant from performing past relevant work or narrow the range of other work the claimant may still be able to do. *Wells*, 727 F.3d at 1064-65, 1068-69; 20 C.F.R. § 416.945(a)(2); SSR 96–8p, 1996 WL 374184, at *4. Thus, when an ALJ finds mild mental limitations at step two, he must further analyze at step four how, if at all, the claimant's non-severe mental impairment impacts her ability to perform work-related mental functions. *Wells*, 727 F.3d at 1064-65, 1068-69. A step-two analysis limited to severity does not satisfy this obligation. *Id.*

Here, the ALJ found mild limitations in Ms. Martinez's mental functioning due to her anxiety disorder at step two, but failed to discuss how, if at all, the disorder impacts her ability to perform work-related mental functions in formulating her RFC at step four. Moreover, his step-four evaluation of the state agency psychological consultants' prior administrative findings, and his step-four reference to his own step-two analysis, suggest that he improperly relied on his and the consultants' findings of non-severity to conclude that no mental RFC analysis was needed. He therefore erred by failing to provide the Court with a sufficient basis to determine that he applied correct legal standards in formulating Ms. Martinez's RFC. *Keyes-Zachary*, 695 F.3d at 1166;

*Jensen*, 436 F.3d at 1165.

>    2.  *The ALJ's failure to address how Ms. Martinez's anxiety disorder impacts her work-related mental functions was not harmless.*

Having found that the ALJ erred by failing to address Ms. Martinez's anxiety disorder in formulating her RFC, I must next consider whether this error was harmless. 28 U.S.C. § 2111; *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009). The Tenth Circuit "appl[ies] harmless error analysis cautiously in the administrative review setting." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005). Nevertheless,

>    harmless error analysis … may be appropriate to supply a missing dispositive finding where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.[22]

*Id.* at 733-34 (quotation marks and ellipses omitted).

The Tenth Circuit has held that an ALJ's failure to discuss how a non-severe mental impairment impacts a claimant's work-related mental functions at step four is harmless when "[t]here is no substantial evidence that would allow a reasonable administrative factfinder to include any mental limitations in [the claimant's] RFC." *Alvey v. Colvin*, 536 F. App'x 792, 794-95 (10th Cir. 2013). The Commissioner implies that this holding applies here, arguing that "nothing in the record suggests that any workplace restrictions [due to Ms. Martinez's anxiety disorder] were needed." (Doc. 22 at 1-2, 8.) However, as explained below, I disagree, because there is substantial record evidence that would allow a reasonable administrative factfinder to include one or more work-related mental limitations in Ms. Martinez's RFC.

---

[22] However, courts "cannot attempt to supply a missing finding for the ALJ on legal or evidentiary matters that he did not consider because it risks violating the general rule against post hoc justification of administrative action." *Dye v. Barnhart*, 180 F. App'x 27, 31 (10th Cir. 2006) (quotation marks omitted).

Initially, there is the record evidence the ALJ discussed at step two in finding that Ms. Martinez has mild limitations in each of the four broad areas of mental functioning. (AR 22.) This evidence includes Ms. Martinez's reports that she:  (1) experiences some difficulty in following written and spoken instructions; (2) engages in limited social activities; (3) has a limited attention span that curtails her reading; and, (4) cannot handle stress or changes in routine well. (AR 22.) The record evidence also includes Ms. Martinez's reports that she:  (5) was fired or laid off from a job because her boss said she was "out of line," (AR 264); (6) is "manic the next day" and "[c]annot concentrate" when "[e]arthquakes … keep [her] up," (AR 301); (7) can only be on a computer for 20 minutes, (AR 305); and, (8) experiences "[a]nxiety to complete tasks." (AR 305.)

In addition, there is medical record evidence that could support the inclusion of one or more work-related mental limitations in Ms. Martinez's RFC. This includes evidence that:  (9) Dr. Tiernan frequently found Ms. Martinez to be hypomanic on examination, (AR 435-38, 477, 479, 506, 555, 687, 690, 692, 694, 697, 699-700, 702, 704); (10) Dr. Tiernan noted that, at some appointments, Ms. Martinez was so talkative he had to stop her from talking so that he could write her prescriptions, (AR 435-38, 476); and, (11) Dr. Tiernan noted that, at one appointment, Ms. Martinez called a staff member "beautiful," prompting Dr. Tiernan to ask Ms. Martinez "not to say things like that anymore, because someone might complain." (AR 505.) In light of all of this evidence, a reasonable factfinder could have included one or more work-related mental limitations in Ms. Martinez's RFC.[23]

---

[23] Dr. Tiernan also completed two medical source statements in which he referenced Ms. Martinez's anxiety disorder as well as her physical problems and opined that she has significant work-related limitations. (AR 511-17, 771-77.) The ALJ found Dr. Tiernan's opinions "not persuasive" without mentioning Ms. Martinez's anxiety disorder, based on the opinions' internal inconsistencies and their inconsistency with the medical record evidence regarding Ms. Martinez's physical conditions. (AR 25-26.) Ms. Martinez has not challenged the ALJ's rejection of Dr. Tiernan's opinions, (Docs. 16, 23), and so I do not rely on them as substantial evidence of any work-related mental limitations. *See Alvey*, 536 F. App'x at 795 (finding that claimant's testimony was not substantial evidence of work-related limitations from non-severe mental impairment where ALJ discounted her testimony and claimant did not challenge ALJ's credibility determination).

This is not to suggest that a reasonable ALJ would necessarily find that Ms. Martinez has any work-related mental limitations, or that any such limitations are significant. But there is certainly substantial evidence that would allow an ALJ to find some degree of work-related mental limitations. And again, even if these limitations do "not significantly limit [Ms. Martinez's] ability to do basic work activities," they "may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of [her] claim," by preventing her from performing past relevant work or narrowing the range of other work she can still do. SSR 96–8p, 1996 WL 374184, at *5. Thus, the ALJ's failure to discuss how, if at all, Ms. Martinez's anxiety disorder impacts her ability to perform work-related mental functions in formulating her RFC was not harmless and requires reversal and remand.

**B.     Any error in the ALJ's step-four finding regarding Ms. Martinez's past relevant work was harmless.**

Ms. Martinez also argues that the ALJ made an erroneous step-four finding regarding her past relevant work. (Doc. 16 at 1, 10-12.) Specifically, she argues that substantial evidence does not support the ALJ's determination that her 2015-2016 job as a receptionist at NM Works qualifies as substantial gainful employment and therefore past relevant work. (*Id.*) However, even assuming the ALJ erred in this regard, which is by no means clear, the error was plainly harmless.

Initially, I am not persuaded that the ALJ erred in finding that Ms. Martinez's job at NM Works qualifies as past relevant work. The ALJ so found on the basis that, among other things, Ms. Martinez received "sufficient compensation to qualify the work as substantial gainful activity." (AR 27.) In support, he noted that Ms. Martinez "stated that she earned $9 per hour, and worked eight hours per day, five days per week," and that this "corresponds to monthly earnings

above the minimum amount needed to qualify as substantial gainful activity (SGA)" for the years in question. (AR 27.)

The ALJ's reasoning appears to be legally and factually supported. The parties agree that for a job to qualify as past relevant work, a claimant must earn enough for the work to be considered substantial gainful activity ("SGA"), and that for a job to qualify as SGA, the claimant had to earn at least $1,090 per month in 2015, and $1,130 per month in 2016. (Doc. 16 at 11; Doc. 22 at 9.) And as the ALJ found, Ms. Martinez reported that she worked at NM Works for eight hours per day, five days per week, for $9 per hour. (AR 27, 43, 266, 268.) Assuming, conservatively, that an employee working full-time for a full year will work for 48 out of 52 weeks, this wage rate amounts to about $17,280 per year, or $1,440 per month, which is over the SGA thresholds for 2015 and 2016.[24]

Ms. Martinez argues that she earned only $470 per month in 2015, and $905.83 per month in 2016, at NM Works. (Doc. 16 at 11.) In support, she points to documentary evidence that she earned $2,820 in 2015, and $10,870 in 2016, (AR 216-17, 230-45), and her report that she worked at this job from June 2015 to December 2016, (AR 266), dividing $2,820 by six months, and $10,870 by twelve, to arrive at the monthly income figures she proffers. Ms. Martinez also points to what appears to be a very small question mark next to her notation of having earned $9 per hour to discredit the notation. (Doc. 16 at 12; *see* AR 268.)

However, as the Commissioner observes, the documentary evidence on which Ms. Martinez relies includes "no monthly breakdown" of her income in 2016, and so does not conclusively show

---

[24] Eight hours per day multiplied by five days per week equals 40 hours per week; 40 hours per week multiplied by 48 weeks per year equals 1,920 hours per year; 1,920 hours per year multiplied by $9 per hour equals $17,280 per year; and, $17,280 per year divided by 12 months equals $1,440 per month.

that [she] worked all 12 months [in 2016] and therefore earned only $905.83 per month. Indeed, it is far more likely that she did not in fact work all 12 months. If [her] position were accurate, that would mean that she was earning well below New Mexico's $7.50 per hour minimum wage in 2016.[25] Thus, it is unsound to assume that the $10,870 represented 12 months of employment.

(Doc. 22 at 9-10.)

The same principles hold true for 2015. The documentary evidence includes no monthly breakdown of Ms. Martinez's income for that year and does not conclusively demonstrate that she worked continuously for six months. And, if she had been paid $470 per month as she claims, she would have been earning around $3 per hour, far below minimum wage.[26]

Furthermore, Ms. Martinez has presented no authority to refute the Commissioner's common-sense proposition that the ALJ should be permitted to believe her when she reported that she worked forty hours per week for $9 per hour. (Doc. 22 at 10; *see generally* Docs. 16, 23.) And even if the ALJ were required to accept the small marking next to the "$9" on Ms. Martinez's Work History Report as a question mark denoting uncertainty about how much she earned, (AR 268), a reasonable factfinder could certainly rely on the report to conclude that she earned *approximately* $9 per hour, as opposed to the substantially lower and indeed illegal rates of $2.94 and $5.66 per hour.

Nevertheless, even assuming the ALJ erred in finding that Ms. Martinez earned enough at NM Works for the job to qualify as past relevant work, the error is plainly harmless. *Fischer-Ross*,

---

[25] $905.83 per month multiplied by 12 months equals $10,870 per year, and $10,870 per year divided by 1,920 hours per year equals about $5.66 per hour. The Commissioner does not cite to any authority establishing New Mexico's minimum wage in 2015 or 2016. (*See* Doc. 22 at 9-10.) However, the Court takes judicial notice that the federal minimum wage in 2015 and 2016 was $7.25 per hour. *See* United States Department of Labor, *"Fair Labor Standards Act Advisor,"* https://webapps.dol.gov/elaws/faq/esa/flsa/001.htm?_ga=2.130966283.502022116 .1708709464- 780736474.1708709462 (last accessed Feb. 23, 2024).

[26] $470 per month multiplied by 12 months equals $5,640 per year, divided by 1,920 hours per year equals about $2.94 per hour.

431 F.3d at 733-34. As discussed in Section II., above, the ALJ did find at step four that Ms. Martinez is not disabled because she can still perform her past relevant work as a receptionist. (AR 27.) Nevertheless, the ALJ proceeded to step five and made the alternative finding that Ms. Martinez is not disabled because she can perform other work that exists in significant numbers in the national economy, specifically, the representative occupations of marker and office helper. (AR 27-29.) In other words, the ALJ made a finding of non-disability at step five that is wholly independent of his step-four finding that Ms. Martinez's receptionist job at NM Works constitutes past relevant work. Any error in the ALJ's finding regarding past relevant work is therefore harmless and not a proper ground for reversal of the ALJ's decision. *See Murrell v. Shalala*, 43 F.3d 1388, 1389-90 (10th Cir. 1994) (where ALJ made alternative findings of non-disability at steps four and five, ALJ's step-five finding was "by itself, a sufficient basis for the denial of benefits … regardless of the merit of [the claimant's] arguments relating to step four").[27]

## V. <u>Conclusion</u>

For the reasons stated above, I recommend that Plaintiff's Motion to Reverse or Remand Administrative Agency Decision (Doc. 16) be GRANTED, and that the Commissioner's decision denying Ms. Martinez's claim for SSI be REVERSED and this matter REMANDED to the Commissioner for further proceedings in accordance with these Proposed Findings and Recommended Disposition.

**Timely objections may be made pursuant to 28 U.S.C. § 636(b)(1)(C).   Within fourteen (14) days after a party is served with a copy of these proposed findings and**

---

[27] However, if the ALJ includes any work-related mental limitations in Ms. Martinez's RFC on remand, he must of course determine whether these limitations, in combination with any physical limitations in the RFC, would preclude Ms. Martinez from performing the mental and physical demands of any past relevant work at step four, and, if so, of any representative occupations that exist in significant numbers in the national economy at step five. 20 C.F.R. §§ 416.920, 416.945.

recommended disposition, that party may, pursuant to Section 636(b)(1)(C), file written objections to such proposed findings and recommended disposition with the Clerk of the United States District Court for the District of New Mexico.  A party must file any objections within the fourteen-day period allowed if that party wants appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE